## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

M.Y.,

       Plaintiff,

v.

Leland Dudek,[1] Acting Commissioner
of Social Security Administration,

       Defendant.

Case No.  24-CV-00563 (ECW)


**ORDER**

---

This matter is before the Court on Plaintiff M.Y.'s ("Plaintiff") Motion for
Summary Judgment (Dkt. 7) and Defendant's Brief in Support of the Commissioner's
Final Decision (Dkt. 10).[2]  Plaintiff filed this case seeking judicial review of a final
decision by Defendant denying her application for disability and supplemental insurance
benefits under Titles II and XVI of the Social Security Act.  For the reasons stated below,
Plaintiff's Motion is granted in part and this case is remanded to the Commissioner for
further development.

---

[1]     Leland Dudek is now the Acting Commissioner of Social Security and is
automatically substituted as a party pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure.  *See* Fed. R. Civ. P. 25(d).

[2]     As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are
"presented for decision on the parties' briefs," rather than summary judgment motions.
Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

## I.    BACKGROUND

Plaintiff filed a claim for disability insurance benefits and supplemental security income on June 3, 2021.  (R. 185-200.)[3]  She alleged disability based on back pain, numbness in her legs, and depression.  (R. 216.)  Her claims were denied initially and on reconsideration.  (R. 106-15, 127-34.)  Plaintiff alleged disability beginning January 1, 2017, but the Social Security Administration ("SSA") amended her disability onset date to April 1, 2016.  (R. 20, 185.)  Plaintiff appeared with her representative during a telephonic hearing before Administrative Law Judge Mary Morrow ("ALJ") on February 16, 2023.  (R. 36.)  On March 16, 2023, the ALJ issued a decision denying Plaintiff's applications.  (R. 14-35).

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[4] the ALJ first determined at step one that Plaintiff had not engaged in

---

[3]    The Administrative Record ("R.") can be found at Docket 6.

[4]    The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

substantial gainful activity during the period from the alleged onset date of April 1, 2016.

(R. 20.)

At step two, the ALJ determined that Plaintiff had the following severe

impairments: mild degenerative spondylosis; major depressive disorder; and unspecified

anxiety disorder.  (R. 20.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that

met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part

404, subpart P, appendix 1.  (R. 20-23.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had

the following residual functional capacity ("RFC"):

> [T]o perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> (lift/carry, push/pull up to 20 pounds occasionally and 10 pounds frequently;
> sit for about 6 hours, and stand/walk for about 6 hours total in an 8-hour
> workday) with the following limitations: occasionally climb ramps and
> stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop,
> kneel, crouch, and crawl; and frequently reach overhead with the bilateral
> upper extremities. She can never be exposed to hazards such as moving
> machinery and unprotected heights; and is limited to performing simple,
> routine, and repetitive three-to-four -step tasks (but not at a production-rate
> pace (so, for example, no assembly line work). She can respond appropriately
> to occasional, superficial interaction with supervisors, co-workers, and the
> general public; and can tolerate few changes in the work setting, defined as
> routine job duties that remain static and are performed in a stable, predictable
> work environment.

(R. 23-24.)

The ALJ concluded, based on the above RFC and the testimony of the vocational

expert ("VE"), that Plaintiff was capable of performing the requirements of representative

occupations such as fruit distributor (DOT# 921.685-046; 10,000 jobs nationally), marker

(DOT# 209.587-034; 130,000 jobs nationally), and bagger (DOT# 920.687-018; 16,000 jobs nationally).  (R. 29.)

Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 29-30.)

Plaintiff requested review of the decision and the Appeals Council denied further review on January 3, 2024, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-7.)  Plaintiff then commenced this action for judicial review.

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.

## II.     RELEVANT RECORD

### A.     Medical Record

Xulivong Moua, MA, LPCC, on April 23, 2021, conducted a diagnostic assessment for Plaintiff and diagnosed her with major depressive disorder, recurrent severe, without psychotic features.  (R. 349.)  Between May 7 and December 13, 2021, Plaintiff was seen for telehealth psychotherapy with Therapist Moua, during which she was described as irritable/angry, fatigued, and in a depressed mood, anxious at times, but cooperative and able to talk in a normal tone, with pain and family problems identified as the major stressors.  (R. 335-45.)

On October 21, 2021, Plaintiff was referred by Social Security Disability Determination Services to Lyle W. Wagner III, PhD, LP, to conduct a mental status examination of Plaintiff for the purposes of her application for Social Security benefits. (R. 318.)  Plaintiff reported that she had never been hospitalized for mental health reasons, and that while she took an unspecified mental health medication for depression,

4

and trazodone[5] for sleep beginning in 2020, which she took for several months, she discontinued them because she had stopped seeing her medical provider due to the pandemic. (R. 319.) She reported that the medications were somewhat helpful and that she had not taken medications for her mental health prior to 2020. (R. 319.) Plaintiff had been attending outpatient psychotherapy once weekly, and had been doing so for the previous 2 years, which she found to be helpful. (R. 319.) With respect to her physical pain, Plaintiff reported taking Tylenol, which she claimed was somewhat helpful for her leg and back pain. (R. 319.) Plaintiff also reported having minor children that she took care of when they were not in school, with the help of her oldest daughter who did most of the dinner preparation and laundry. (R. 320.) Plaintiff's ability to recall 4 digits and 2 digits placed her at the 2nd percentile, suggesting that her attention span was in the bottom of the borderline range. (R. 321.) Plaintiff was unable to complete serial 7s backwards and unable to perform serial 3s forward, suggesting some difficulty with concentration. (R. 321.) In addition, Plaintiff was able to recall 3 of 3 objects immediately, then recalled 0 of 3 objects after five minutes, suggesting significant difficulty with delayed memory. (R. 321.) It was noted at the beginning of the mental status examination that Plaintiff was "rarely spontaneous, generally with an unremarkable response time, but at times when asked certain questions during the mental status examination she responded very quickly, possibly not giving full effort in her attempt to

---

[5]    Trazodone is used to treat depression and is also used to treat insomnia. *See* Trazodone, MedlinePlus, https://medlineplus.gov/druginfo/meds/a681038.html (last visited March 3, 2025).

retrieve information." (R. 320.) The diagnostic impression for Plaintiff was Major

Depressive Disorder, Recurrent, Moderate; and Unspecified Anxiety Disorder. (R. 333.)

According to Dr. Wagner, Plaintiff's mental functioning was as follows:

> Based on her Verbal I.Q. in the Borderline to Low Average range, and current mental status examination, [Plaintiff] is capable of understanding simple instructions, while she will have significant difficulty remembering, and following said instructions. Based on results from the current MS exam, [Plaintiff] will have Moderate to Severe difficulty sustaining attention and concentration. At this time, [Plaintiff] will have Moderate difficulty in regard to carrying out work-like tasks with reasonable persistence and pace, based on the current mental status examination. It is this examiner's opinion that [Plaintiff] would have moderate difficulty responding appropriately to brief and superficial contact with co-workers, supervisors, and the public. At this time, [Plaintiff] will have Moderate difficulty tolerating the stress and pressure typically found in an entry-level workplace, based **solely** on her mental health symptoms.

(R. 322.)

On November 6, 2021, Plaintiff was seen by Rachel Sumo, CNP, for a

musculoskeletal exam, as a requirement for her Social Security disability application. (R.

325.) Plaintiff reported that she had back pain, mainly in the lower back, that was

constant and rated her pain at 8/10. (R. 325.) Her back pain was worse with standing,

bending, squatting, and any activities that involved her back increased her back pain. (R.

325.) Plaintiff also reported back pain when she sat for a long time and said she could

walk for up to five minutes. (R. 325.) Plaintiff claimed that she sometimes took Tylenol,

which made her pain tolerable. (R. 325.) She also noted she had numbness and tingling

in her lower back and that walking for up 5 minutes would result in tingling numbness in

her feet and back pain. (R. 325.) Plaintiff claimed that she could not sit in one position

due to numbness. (R. 325.) In addition, Plaintiff reported that she had depression for 20

years, had taken medication for the condition, but had not seen a doctor since the pandemic.  (R. 325.)

Upon examination, Plaintiff had an appropriate mood and affect, with good judgment and insight.  (R. 326.)  Motor function was normal, and sensation was intact. (R. 327.)  With respect to her extremities, full range of motion was noted as to all joints and muscle strength was 5/5 bilaterally.  (R. 327.)  Plaintiff exhibited a normal gait, but showed tenderness at the left sciatica on palpitation and pain with flexion and extension. (R. 327.)  Plaintiff's range of motion was normal.  (R. 327-28.)  Plaintiff was able to tandem walk but was only able to walk on her heels and not her toes.  (R. 327.)  Her grip strength was also normal.  (R. 329.)  CNP Sumo's conclusion as to Plaintiff was back pain with sciatica, given her tenderness at the left sciatica during the examination.  (R. 330.)  It was also noted that an x-ray showed mild degenerative spondylosis of the lumbar spine.  (R. 330, 331.)  CNP Sumo also offered the following work limitations:

> [O]ne might consider stand/walk limited to moderately hours in an 8-hours day due to back pain, avoid prolonged standing/walking of more than minutes at a time; can sit moderately in an 8-hour day; postures limited to occasionally for bending due to back pain, can perform fine manipulation frequently, can lift up to 10 lbs frequently.

(R. 330.)

On November 18, 2021, state agency psychologist Jeffrey Boyd, PhD, LP, found based on the existing record that Plaintiff had severe mental impairments in the form of an anxiety and obsessive-compulsive disorder and a depressive, bipolar and related disorder.  (R. 64.)  Dr. Boyd then conducted a psychiatric review technique as to Listings 12.04 and 12.06.  Under the "B" criteria of the Listings, Dr. Boyd found that Plaintiff had

7

moderate limitations as to her ability to understand, remember, or apply information and with respect to her ability to concentrate, persist, or maintain pace. (R. 65.) Plaintiff had mild limitations as to her ability to interact with others and to adapt or manage oneself. (R. 65.) There was no evidence of the presence of "C" criteria. (R. 65.) With respect to her RFC, Dr. Boyd opined that Plaintiff was not significantly limited as to her ability to remember locations and work-like procedures; to understand and remember very short and simple instructions, to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to make simple work-related decisions; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 69-70.) Dr. Boyd also found that Plaintiff was moderately limited as to her ability to maintain attention and concentration for extended periods; and markedly limited as to her ability to understand and remember detailed instructions and carry out detailed instructions. (R. 69-70.) In terms of narrative limitations, Dr. Boyd offered the following for Plaintiff:

> Claimant retains sufficient mental capacity to concentrate on, understand, and remember routine, repetitive and 3-4 step uncomplicated instructions, but would be markedly impaired for detailed or complex/technical instructions.

* * *

8

Claimant's ability to carry out routine, repetitive and 3-4 step tasks with adequate persistence and pace would not be significantly limited, but would be markedly limited for detailed or complex/technical tasks.

(R. 69-70.) On reconsideration on February 13, 2022, Amelia Versland, PhD, LP, identified the same mental restrictions for Plaintiff. (R. 89-90.)

With respect to physical impairments, on November 24, 2021, state agency doctor Gregory Salmi, MD, opined that Plaintiff could occasionally lift 20 pounds and could frequently lift 10 pounds. (R. 78.) Dr. Salmi also found that Plaintiff could sit, stand, or walk for about 6 hours in an 8-hour workday. (R. 78.) In addition, Dr. Salmi opined that Plaintiff could occasionally climb ramps/stairs, climb ladders, balance, stoop, kneel, crouch, and crawl. (R. 78.) With respect to manipulative limitations, Dr. Salmi opined that Plaintiff had an unlimited ability to reach, engage in handling and fingering, and feel. (R. 79.) Plaintiff was found to be limited in both extremities to frequent reaching overhead. (R. 79.) Plaintiff had no visual, communicative or environmental limitations. (R. 79.) On reconsideration, Paul Ossmann, MD, on February 14, 2022, offered the same physical restrictions for Plaintiff. (R. 89-90.)

On April 4, 2022, Therapist Moua issued a mental medical source statement based on a check-box questionnaire provided by Plaintiff's counsel. (R. 351-53.) Therapist Moua opined that Plaintiff retained a fair ability to understand and remember short, simple instructions; work with or near others without being distracted by them; interact appropriately with the public; ask simple questions or request assistance; get along with co-workers and peers; and travel in unfamiliar places or use public transportation. (R. 351-52.) Therapist Moua also opined that Plaintiff had a poor ability to carry out short,

simple instructions; understand and remember detailed instructions; make judgments on simple work-related decisions; remember locations and work-like procedures; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; complete a normal workday or workweek; perform at a consistent pace; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independent of others. (R. 351-52.)  Therapist Moua believed that Plaintiff would be off-task 25% or more during a typical workday due to interference with her attention and concentration, need to be off more than four times per month due to her impairment or treatment, and that her condition started in May 2017 and was anticipated to last longer than four months.  (R. 353.)  The basis for these opinions was Plaintiff's anxiety, racing thoughts, sleep issues and fatigue, poor focus, anger and irritability, and excessive worrying.  (R. 351.)  The prognosis was poor due to financial and family stress.  (R. 351.)  The diagnoses for Plaintiff included major depressive disorder, recurrent moderate; other developmental disorders of scholastic skills; and an undifferentiated somatoform disorder.  (R. 351.)

On April 22, 2022, Plaintiff underwent a physical therapy evaluation.  (R. 444.)  It was noted that the Plaintiff claimed that she could tolerate sitting for 10 minutes, standing for 5 minutes, and walking for 5 minutes before experiencing increased symptoms.  (R. 444.)  Plaintiff presented with symptoms consistent with L4/5 disc protrusion or

herniation and/or sciatica-type symptoms.  (R. 447.)  Plaintiff had been recommended for surgery and injections, which she did not want to pursue.  (R. 447.)  Plaintiff sought a full body massage during the appointment and the PT explained the difference between "OT [occupational therapy] and MMT [Medical Manual Therapy]" to Plaintiff.  (R. 447.)  The PT recommended a consultation with their doctor if Plaintiff sought massage and "stressed [the] importanace [sic] of exercise as the most beneficial long term care for her."  (R. 447.)

On April 25, 2022, Plaintiff was seen by Mark Agre, MD, for an initial consultation regarding her complaints of low back pain, leg pain, and hip pain.  (R. 441.) She reported suffering from chronic low back pain and pain into her bilateral legs.  (R. 441.)  Upper back pain was also present, as well as pain radiating into her left leg.  (R. 441.)  Plaintiff asserted that her symptoms made her wake up at night and that her symptoms were worse when lifting/carrying.  (R. 441.)  Plaintiff's examination showed she was not in any acute distress, she responded well, did not appear withdrawn, she had a normal affect, was pleasant, and was cooperative.  (R. 442.)  Her cervical spine was largely normal and she had a negative straight leg raise, no ankle dorsiflexion weakness, no plantar flexion weakness, no knee extension weakness, a decreased range of motion, lumbar radicular signs, a normal gait, and restricted range of motion in her shoulders with elements of impingement and tenderness.  (R. 442.)  The plan for Plaintiff was to participate in MMT in conjunction with active therapy, and to obtain orthotics.  (R. 443.)

On May 16, 2022, Plaintiff underwent MMT, which had been started on April 29, 2022 to treat her back and leg pain, and provided her with temporary relief for a few days.  (R. 432-33, 439.)

On June 29, 2022, Plaintiff was again seen by Dr. Agre regarding her complaints of low back pain, leg pain, and hip pain.  (R. 418.)  It was noted that Plaintiff had been receiving occupational and physical therapy, and that in early June Plaintiff requested a TENS unit for her neck and shoulder.  (R. 418.)  Her examination showed she was not in any acute distress, she responded well, did not seem withdrawn, had a normal affect, was pleasant, and was cooperative.  (R. 418-19.)  Plaintiff's cervical spine was largely normal and she had a negative straight leg raise, no ankle dorsiflexion weakness, no plantar flexion weakness, no knee extension weakness, a decreased range of motion, lumbar radicular signs, she had a normal gait, and restricted range of motion in her shoulder with elements of impingement and tenderness.  (R. 419.)  The plan for Plaintiff was to continue with her occupational therapy, physical therapy, and to use a TENS unit.  (R. 419-20.)

On July 21, 2022, Plaintiff underwent physical therapy, and it was noted that she had not been to therapy in almost two months, because "she's been busy."  (R. 413.)  Plaintiff believed she was too old for exercises, and that massage and pulling was the only way to help her.  (R. 413.)

Between August 8 to August 23, 2022, Plaintiff received MMT, which Plaintiff claimed provided her with relief for between 1-2 days.  Plaintiff continued to complain of varying pain in her neck, lower back, shoulders, feet, and leg.  (R. 396-403.)

Plaintiff represented during her August 24, 2022 therapy session that she was exercising 15 minutes a day and walking 15 minutes a day.  (R. 393.)  Plaintiff's shoulder and leg continued to be in pain daily, but she noted improvement.  (R. 393.)

On August 25, 2022, Plaintiff was seen by Dr. Agre for a follow-up regarding her complaints of lower back pain, leg pain, and hip pain.  (R. 390.)  It was noted that Plaintiff had been receiving occupational and physical therapy, which Plaintiff reported as being helpful, but that her symptoms returned when she was not in therapy.  (R. 390.)  She also reported taking meloxicam (a nonsteroidal anti-inflammatory drug), which she found to be beneficial.  (R. 390.)  Plaintiff had also been dealing with radiculopathy and hip pain, and Dr. Agre offered her an epidural, which she declined.  (R. 390.)  Her examination showed she was not in any acute distress, she responded well, she did not appear withdrawn, she had a normal affect, was pleasant, and was cooperative.  (R. 390.)  Her cervical spine was largely normal; she had a negative straight leg raise, no ankle dorsiflexion weakness, no plantar flexion weakness, no knee extension weakness; she showed a decreased lumbar range of motion, lumbar radicular signs; and she had a normal gait, and restricted range of motion in her shoulder with elements of impingement and tenderness.  (R. 391.)  The plan for Plaintiff was to continue with her occupational therapy and physical therapy and use trazadone and gabapentin[6] for her sleep and pain.  (R. 391-92.)

---

[6]   Gabapentin is used to treat seizures and neuropathic pain.  *See* Gabapentin, MedlinePlus, https://medlineplus.gov/druginfo/meds/a694007.html (last visited March 3, 2025).

On August 31, 2022, Plaintiff reported relief from MMT.  (R. 388.)  She claimed less pain and numbness and more movement in her lower back and leg.  (R. 388.)  This relief lasted for two days.  (R. 388.)

On September 22, 2022, Plaintiff was again seen by Dr. Agre regarding her complaints of lower back pain, leg pain, and hip pain.  (R. 381.)  Plaintiff had been receiving occupational and physical therapy, which Plaintiff reported as being helpful.  (R. 381.)  Plaintiff had also been dealing with radiculopathy and Dr. Agre offered her gabapentin for sleep, which she claimed had been very helpful.  (R. 381.)  Her examination showed she was not in any acute distress, she responded well, did not seem withdrawn, had a normal affect, was pleasant, and cooperative.  (R. 381-82.)  Her cervical spine was largely normal; she had a negative straight leg raise, no ankle dorsiflexion weakness, no plantar flexion weakness, no knee extension weakness, a decreased range of motion of the lumbar region, lumbar radicular signs; and she had a normal gait and restricted range of motion in her shoulder with elements of impingement and tenderness.  (R. 382.)  The plan for Plaintiff was to continue with her occupational therapy, obtain an updated lumbar orthotic and to continue using gabapentin.  (R. 382-83.)

On September 30, 2022, Plaintiff represented that physical MMT therapy provided her with over 2 days of relief.  (R. 384.)  Plaintiff's main complaints were lower back pain that radiated into the left leg.  (R. 384.)

On September 30, 2022, Plaintiff returned to therapy after a few weeks off, complaining her pain had become worse without therapy, including her left sciatica

symptoms.  (R. 376.)  It was noted that Patient was making good progress in therapy, but then when she took a three-week break, she was unable to continue with her exercises, she forgot what to do, and returned to overstretching her hamstring on the left, which was putting increased strain on her sciatic nerve.  (R. 379.)  Barrier to further progress included a language barrier, education history, depression, and sedentary lifestyle.  (R. 379.)

On October 4, 2022, Plaintiff represented at her physical therapy session that her left leg pain was constant, burning, throbbing and radiating into her groin.  (R. 373.)  On October 31, 2022, Plaintiff reported that therapy provided relief to her leg pain, but that it only lasted 6-8 hours.  (R. 367.)  Her exercises included using a leg press with 70 pounds. (R. 368.)

During her November 1, 2022 therapy session, Plaintiff asserted that the therapy had resulted in the "calming down of her symptoms by 50%."  (R. 362.)  Plaintiff's home therapy included yoga, therabands, and a foam roller.  (R. 364.)  On November 9, 2022, Plaintiff underwent physical therapy, during which she noted finally having feeling in her lower left extremity, that her shoulder pain was improving, and that she was experiencing right side neck pain.  (R. 359.)

On November 29, 2022, Plaintiff had her last therapy session.  (R. 354.)  Plaintiff reported good relief to her lower leg extremity pain, but increased back pain due to her period.  (R. 354.)

Between December 2021 through December 2022, Plaintiff was seen for mental health therapy regarding her depression, during which she was cooperative, irritable,

anxious, and depressed.  (*See*, *e.g.*, R. 449-486.)  The diagnosis by Therapist Moua for Plaintiff was major depressive disorder recurrent severe without psychotic features and a disorder related to scholastic skills.  (R. 487.)  The short-term goal of therapy was to identify and replace cognitive self-talk that was engaged in to support depression.  (R. 487, 491.)  A long-term goal for Plaintiff was to assist her in identifying conflicts that could be addressed with problem-solving techniques.  (R. 488.)  During her telehealth therapy, Plaintiff was instructed to have more social contact with her family and friends; to be less pessimistic about her pain, weight issues, and financial situation; and be more motivated.  (*See*, *e.g.*, R. 449-486.)  Plaintiff did note during one of her sessions that she was unable to work because of pain issues.  (R. 463.)  During her July 1, 2022 therapy session, Plaintiff reported that her pain had been a little better due to medications and therapy.  (R. 477.)  On April 15, 2022, Plaintiff discussed her battles with her weight and noted that it had been difficult for her to change her diet due to having children living with her and cooking different things for herself and for her children.  (R. 481.)

## B.    Function Reports

On June 20, 2021, Plaintiff filled out an adult function report with the assistance of a third party.  (R. 225.)  Plaintiff represented that she was unable to stand for long periods of time and that her left leg was in pain when she walked.  (R. 225.)  Plaintiff claimed she stayed at home because she was unable to tolerate the pain caused by moving around too much.  (R. 226.)  She noted taking care of her two younger daughters (ages 10 and 11), who she looked after with the help of her oldest daughter.  (R. 226.)  She was able to care for her hair, shave, and feed herself.  (R. 226.)  She asserted that she had difficulty lifting

her leg if she wore pants, had difficulty moving around while bathing, and had difficulty moving on the toilet.  (R. 226.)  Plaintiff claimed that she needed reminders to do certain tasks because she is often stressed about her condition, making her forgetful.  (R. 227.)  Her oldest daughter prepared meals due to Plaintiff's difficulty with standing and moving around.  (R. 227.)  Plaintiff claimed she drove.  (R. 228.)  Plaintiff also noted that she went grocery shopping once a week for about an hour.  (R. 228.)  In addition, Plaintiff represented she could not garden as much as she used to, she watched television, and that she only spent time with her three daughters.  (R. 229.)  Plaintiff reported that she had no problems getting along with family, friends, neighbors, or others, and had no problems with authority figures.  (R. 230, 231.)  Plaintiff maintained that she could only walk 5-10 minutes before needing to rest.  (R. 230.)  Her fears related to being unable to financially care for her daughters.  (R. 231.)  She needed no assistance with walking.  (R. 231.)  Plaintiff was taking no medications for her conditions.  (R. 232.)

In a second function report, dated January 21, 2022, Plaintiff claimed she could not sit, stand, or walk for very long due to weakness in her left leg that caused her pain.  (R. 254.)  She claimed she did not take care of any of her children.  (R. 255.)  She was able to deal with her activities of personal care.  (R. 255.)  She again noted that she was forgetful, needing reminders to take her medications and go to medical appointments; a personal care attendant ("PCA") did her household chores; she was able to drive to grocery store; she had no problems with others or authority figures, although she angered easily; and she had stopped visiting people.  (R. 256-58.)  Plaintiff claimed she was tired and weak, had problems focusing, and had low motivation due to pain.  (R. 259.)

Plaintiff claimed she could walk 5-6 blocks before needing to rest for 20-30 minutes, and could not follow instructions due to an inability to focus.  (R. 259.)  Plaintiff worried a lot about money and health issues.  (R. 260.)  Plaintiff asserted that she was taking meloxicam,[7] citalopram,[8] and trazadone.  (R. 261.)

## C.    Plaintiff's Testimony at the February 16, 2023 Hearing Before the ALJ

Plaintiff testified at the hearing before the ALJ that she lived with her two youngest daughters who were 12 and 13, and for whom she had sole custody.  (R. 43-44.) She claimed that she took care of them when they were young, but that now they took care of themselves.  (R. 45.)  Plaintiff also testified that she had a PCA that would come to help her with daytime activities.[9]  (R. 45-46.)  The PCA helped Plaintiff cook, dressed her, gave her baths, and sometimes helped her to use the bathroom if needed.  (R. 46.) She needed this help because of her back pain and leg numbness.  (R. 46.)  Plaintiff asserted that she did not have good concentration, resulting in a burned pot, but that she

---

[7]    "Meloxicam is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints)."  Meloxicam, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a601242.html (last accessed March 3, 2025).

[8]    Citalopram "is used to treat depression" and "is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs)."  Citalopram, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a699001.html (last visited March 3, 2025).

[9]    Although the transcript from the hearing before the ALJ is unclear as to whether Plaintiff received 3 hours of assistance on a weekly or daily basis (R. 46), it appears she received PCA services on a daily basis (*see* R. 241, 378), consistent with Plaintiff's assertion that she received 3 hours of assistance a day (Dkt. 8 at 22).

was able to drive. (R. 46.) She claimed to only drive a short distance to the local store once or twice a month. (R. 46.) Plaintiff noted that she needed reminders to take her medications. (R. 47.) In addition, Plaintiff maintained that she was irritated and depressed all of the time. (R. 47.)

## III.    LEGAL STANDARD

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.* 907 F.3d 1086, 1089 (8th Cir. 2018). As defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means— and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (cleaned up).

"[T]his court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (marks and citation omitted). "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions

is that of the [ALJ], the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)).

## IV.    DISCUSSION

Plaintiff contends that the ALJ erred in her RFC determination.  (*See* Dkt. 8 at 14.) Specifically, Plaintiff argues that: (1) the ALJ appropriately found Drs. Boyd and Versland's opinions persuasive but then failed to incorporate all their opined limitations into the RFC; (2) the ALJ failed to perform a consistency analysis of Dr. Wagner's, Therapist Moua's, and CNP Sumo's disabling medical opinions; (3) the ALJ appropriately found CNP Sumo's sedentary lifting restriction "consistent with the record" but then failed to find Plaintiff disabled as required by grid rule 201.17; (4) the ALJ failed to account for Plaintiff's subjective complaints; and (5) that the ALJ's RFC analysis is replete with factual errors and misrepresentation of the record.  (*See id*. at 14-25.)  In addition, Plaintiff asserts that the ALJ committed reversible error by failing to elicit any explanation for multiple unresolved conflicts between the VE's testimony and the DOT classifications.  (*Id.* at 26-32.)

### A.    Plaintiff's RFC

"A disability claimant has the burden to establish [her] RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* at 591. (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical

evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.*
(quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).  However,
contrary to Plaintiff's position (Dkt. 8 at 15-16), "there is no requirement that an RFC
finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926,
932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks
v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  Rather, the RFC should be "based on
all of the relevant evidence, including the medical records, observations of treating
physicians and others, and an individual's own description of [her] limitations." *Id.*
(quoting *Myers*, 721 F.3d at 527).  Indeed, "'[e]ven though the RFC assessment draws
from medical sources for support, it is ultimately an administrative determination
reserved to the Commissioner.'" *Perks*, 687 F.3d at 1092 (quoting *Cox*, 495 F.3d at 619-
20) (citations omitted).  That said, an ALJ may not simply draw her own inferences about
a claimant's functional ability from medical reports.  *See Koch v. Kijakazi,* 4 F.4th 656,
667 (8th Cir. 2021) (citation omitted).

    As stated previously, the ALJ set forth the following RFC for Plaintiff:

> [T]o perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> (lift/carry, push/pull up to 20 pounds occasionally and 10 pounds frequently;
> sit for about 6 hours, and stand/walk for about 6 hours total in an 8-hour
> workday) with the following limitations: occasionally climb ramps and
> stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop,
> kneel, crouch, and crawl; and frequently reach overhead with the bilateral
> upper extremities. She can never be exposed to hazards such as moving
> machinery and unprotected heights; and is limited to performing simple,
> routine, and repetitive three-to-four -step tasks (but not at a production-rate
> pace (so, for example, no assembly line work). She can respond appropriately
> to occasional, superficial interaction with supervisors, co-workers, and the
> general public; and can tolerate few changes in the work setting, defined as

routine job duties that remain static and are performed in a stable, predictable work environment.

(R. 23-24.)

### 1.     Binding Effect of Drs. Boyd and Versland's Opinions

As noted above, Plaintiff argues that while the ALJ appropriately found state agency consultants Drs. Boyd and Versland's opinions persuasive, she then failed to incorporate all of their opined limitations into the RFC. (Dkt. 8 at 14.) Specifically, Plaintiff asserts that the ALJ found their opinions "generally persuasive" and generally took no issue with Drs. Boyd and Versland's opinions, except that they were not restrictive enough, finding "a moderate limitation in interacting with others and adapting or managing herself to be persuasive, and provided further limitations with respect to others." (Dkt. 8 at 15 (citing R. 26).) According to Plaintiff, the ALJ's RFC, which limits Plaintiff to "simple, routine, and repetitive three-to-four -step tasks," improperly excluded the restrictions on instructions set forth by Drs. Boyd and Versland. (*Id.*) The Commissioner counters that Plaintiff's argument points to an "inconsequential distinction" between the ALJ's finding that Plaintiff could perform simple, routine, and repetitive three-to-four-step tasks and the doctors' limitations of routine, repetitive and 3-4 step uncomplicated instructions and tasks. (Dkt. 10 at 11.) According to the Commissioner, Plaintiff incorrectly asserts that the doctors' findings are more restrictive than the ALJ's RFC given that the RFC not only limited Plaintiff to simple, routine, and repetitive 3-4 step tasks, but also limited her to working with few changes and routine, static duties. (*Id.*)

The opinions at issue state, among other things, that:

Claimant retains sufficient mental capacity to concentrate on, understand, and remember routine, repetitive and 3-4 step uncomplicated instructions, but would be markedly impaired for detailed or complex/technical instructions.

\* \* \*

Claimant's ability to carry out routine, repetitive and 3-4 step tasks with adequate persistence and pace would not be significantly limited, but would be markedly limited for detailed or complex/technical tasks.

(R. 69-70, 89-90.)

The ALJ addressed those opinions as follows:

With respect to the claimant's mental health, State Agency psychological consultants reviewed the evidence and opined that the claimant was limited to routine, repetitive, 3 to 4 step uncomplicated instructions. They assessed a mild limitation in the claimant's ability to interact with others and adapt or manage herself, and a moderate limitation in her ability to understand, remember, or apply information, and concentrate, persist, or maintain pace. (Exs. 5A, 6A, 7A, 10A.) The undersigned finds these opinions to be **generally persuasive** because the consultants reviewed the claimant's records and carefully considered the claimant's statements regarding alleged symptoms and their effects on functioning in making their assessments. They utilized special knowledge in assessing impairments within the SSA disability standard and their opinions are consistent with the record as a whole. However, given the additional evidence, the undersigned finds a moderate limitation in interacting with others and adapting or managing herself to be persuasive, and provided further limitations with respect to others.

(R. 26 (emphasis added).)

The Court agrees with Commissioner that there is an inconsequential distinction between being able to carry out routine, repetitive, and 3-4 step tasks with adequate persistence and pace, and being able to follow instructions for the same. Regardless, there is no dispute that the ALJ found the opinions of the state agency psychologists

generally persuasive and that indeed, the ALJ included some of their limitations in the RFC.  However, there is "there is no indication that the ALJ afforded the state psychological consultants 'significant weight'—the ALJ simply provided that their opinions were 'generally persuasive.'  Plaintiff does not cite to any authority that the phrase 'generally persuasive' has the equivalent heightened evidentiary weight." *Danny V. v. Kijakazi*, No. 20-CV-2014 (LIB), 2022 WL 1715190, at *13 (D. Minn. Mar. 31, 2022).  "[B]ecause there is no indication that the consultants were afforded controlling weight, the ALJ was not required to include in the RFC <u>every</u> limitation they described." *Id.* at *12.

As such, the Court finds no error by the ALJ **merely** for failing to incorporate verbatim every limitation set forth by the state agency consultants given they were not given controlling weight.

### 2.    Weight Given Medical Opinions

With regard to the weight assessed to medical opinions and administrative findings, pursuant to §§ 404.1520c and 416.920c of the SSA's regulations: "[An ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  When a medical source provides one or more medical opinions or prior administrative medical findings, the ALJ will consider those medical opinions or prior administrative medical findings from that medical source together using the following factors: (1) supportability, (2) consistency, (3) relationship with the claimant (including length and purpose of treatment

and frequency of examinations, among other factors), (4) specialization, and (5) other factors (for example, when a medical source has familiarity with the other evidence in the claim). 20 C.F.R. §§ 404.1520c(a), (c)(1)-(5), 416.920c(a), (c)(1)-(5). The most important factors an ALJ considers when the ALJ evaluates the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 416.920c(a).

The SSA further states:

The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *see also Michael B. v. Kijakazi*, No. 21-CV-1043 (NEB/LIB), 2022 WL 4463901, at *1 (D. Minn. Sept. 26, 2022) ("The 'most important factors' are supportability and consistency.") (citing 20 C.F.R. § 404.1520c(b)(2)).

The SSA has described supportability and consistency as follows:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical

sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2).  "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation."  Revisions to Rules, 82 Fed. Reg. at 5853, 2017 WL 168819 (Jan. 18, 2017); *see also* 20 C.F.R. § 404.1520c(c)(1).  "An ALJ's discussion of [a medical source's] treatment and examination notes reflects the ALJ's consideration of the supportability factor with respect to their opinions." *Stephanie B. v. Kijakazi*, No. CV 22-837 (JWB/DTS), 2023 WL 3394594, at *1 (D. Minn. May 11, 2023) (citation omitted); *Troy L. M. v. Kijakazi*, No. 21-CV-199 (TNL), 2022 WL 4540107, at *11 (D. Minn. Sept. 28, 2022) (addressing the consistency of the medical source's treatment records with the opinion provided as to functioning in conjunction to supportability).  "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim."  Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

The ALJ was required to explain how she considered the supportability and consistency factors when evaluating the persuasiveness of the medical opinions.  *See Shannan G. v. Kijakazi*, No. 22-CV-1895 (NEB/ECW), 2023 WL 4707843, at *14 (D. Minn. June 27, 2023) ("[A]n ALJ must explain how [supportability and consistency] were considered in determining the persuasiveness of a medical opinion.") (cleaned up), *R. & R. adopted*, 2023 WL 4704588 (D. Minn. July 24, 2023).

Here, Plaintiff has made a number of arguments that the ALJ ignored the supportability and consistency analysis as to a number of medical experts and a provider.

### a.    Dr. Wagner

With respect to state agency consultant examiner Dr. Wagner, Plaintiff argues:

- The ALJ ignored the consistency of Dr. Wagner's expert opinions with respect to her inability to carry out instructions with those of Therapist Moua. (Dkt. 8 at 17.)

- The ALJ's generic rejection of Dr. Wagner's opinion as inconsistent, without any specific citation to the record, amounts to a legal error.  (*Id.*)

- The ALJ improperly ignored Wagner's highly supportive objective mental status examination evidence despite referencing some of the evidence in rejecting the opinion in its entirety.  (*Id.* at 18.)

As to Dr. Wagner, the ALJ found as follows:

> He opined that the claimant had moderate to severe difficulty sustaining attention and concentration, and moderate difficulty carrying out work-like tasks with reasonable persistence and pace, responding appropriately to brief and superficial contact with others, and in tolerating the stress and pressure typically found in entry level work. She was able to understand simple instructions, but would have significant difficulty remembering and following those instructions. (Ex. 5F.) The undersigned does not find this opinion to be entirely persuasive as it is inconsistent with the very limited treatment notes.  Treatment notes also do not support the degree of limitation indicated with respect to attention and concentration, nor with respect to difficulty remembering and following instructions.

(R. 27-28.)

As a starting point, the Court agrees with Plaintiff that the ALJ erred by not providing an adequate record that allows the Court to determine whether her consistency analysis is supported by substantial evidence, given that the ALJ's decision does not say what in the treatment notes (presumably Therapist Moua's) contradicted her opinions

regarding Plaintiff's ability to remember and follow simple instructions, leaving Plaintiff and the Court to divine a basis. While the Court agrees with Commissioner that the ALJ need not use a "a particular formula or incant magic words" to meet the requirements for a consistency and supportability analysis (Dkt. 10 at 13), that does not exempt the ALJ from providing reasoning that allows the Court and Plaintiff to understand her rationale. Indeed, "[w]hile an ALJ need not reference every piece of evidence in the record, providing an explanation supported by substantial evidence with reliance on the record is consistent with the purposes of § 404.1520c of allowing Plaintiff and this Court to understand the basis for the ALJ's decision." *See Dwile K. v. Kijakazi*, No. 20-CV-2321 (ECT/ECW), 2022 WL 464950, at *10 (D. Minn. Jan. 27, 2022) (citing 82 FR 5844-01, at 5854, 5858 (Jan. 18, 2017)), *R. & R. adopted*, 2022 WL 462811 (D. Minn. Feb. 15, 2022).

As to supportability, the Commissioner argues that the ALJ discussed Dr. Wagner's report, which noted borderline deficits in attention and delayed memory, but also commented that Plaintiff responded very quickly and possibly did not give full effort in her attempt to retrieve information. (Dkt. 10 at 14 (citing R. 26, 320-322).) While this was referenced by the ALJ as part of the RFC analysis with respect to Plaintiff's testing, there is no direct reference to these observations in the ALJ's RFC analysis with respect to the supportability of Dr. Wagner's opinions, which instead focused on the limited treatment notes (presumably from Therapist Moua). (R. 27-28.) "Several courts have concluded that the regulation cannot be satisfied simply because a court can review the entirety of an ALJ's decision and recitation of the facts to craft a post-hoc rationale for

the ALJ." *Shannan G. v. Kijakazi*, No. 22CV01895 (NEB/ECW), 2023 WL 4707843, at

*17 (D. Minn. June 27, 2023) (collecting cases), *R. & R. adopted*, 2023 WL 4704588 (D.

Minn. July 24, 2023).  The Court will not provide such a rationale for the ALJ, especially

given her reliance appears based on a vague statement by Dr. Wagner at the beginning of

the mental status examination that "Plaintiff was rarely spontaneous, generally with an

unremarkable response time, but at times when asked certain questions during the mental

status examination she responded very quickly, possibly not giving full effort in her

attempt to retrieve information."  (R. 320.)  It is unclear what those questions were or

their significance to the testing (or if the ALJ considered those results in conjunction with

Dr. Wagner's opinion), and indeed, the ALJ relies on this statement for a number of

different levels of mental functioning.  (*See*, *e.g.*, R. 22-23.)

On remand, the ALJ shall reconsider Dr. Wagner's opinions.  If the ALJ finds that

Dr. Wagner's opinions are unpersuasive, the ALJ shall articulate the reasons

underpinning that conclusion, **fully** addressing the supportability and consistency factors

as well as any other relevant factors, "so a reviewing court can make a meaningful

assessment of a challenge to [the] ALJ's evaluation of the persuasiveness of . . . [the]

medical opinion[ ]."  *Hirner v. Saul*, No. 2:21-CV-38 SRW, 2022 WL 3153720, at *9

(E.D. Mo. Aug. 8, 2022).

### b.    Therapist Moua

With respect to Therapist Moua, Plaintiff argues that the ALJ similarly did not cite

specific pages from the record inconsistent with Therapist Moua's treating opinion,

requiring remand.  (Dkt. 8 at 18.)  Plaintiff also argues the ALJ ignored the abnormal

findings regarding Plaintiff made by Therapist Moua.  (*Id.*)

As to Moua, the ALJ found as follows:

The claimant's therapist provided a medical assessment in April 2022 and noted that she treated the claimant for the past year twice a month. (Ex. 8F.) She assessed a poor prognosis due to financial and family stress. She opined the claimant had a poor ability to perform in many areas of vocational functioning, would be off task 25% or more of the workday, and would miss more than 4 days of work per month. (Ex. 8F.) The undersigned does not find this opinion to be entirely persuasive as it is inconsistent with the therapist's own treatment notes which do not support this degree of limitation, and the opinion is inconsistent with the record as a whole. The claimant did not require more intensive treatment, and she was able to perform a wide range of activities without assistance. This is also a checklist provided by the claimant's representative with little explanation for the ratings assigned, some of which are inconsistent. For example, the therapist notes the claimants' [sic] ability to get along with coworkers and the public is "fair", and that she can respond "appropriately with supervisors, coworkers, and work pressures", but then goes on to assign a rating of "poor" for maintaining socially appropriate behavior and responding to workplace changes. There is also no explanation as to why the claimant would be off task 25% of the workday or absent more than 4 days a month. Treatment notes at Exhibit 10F for individual and group therapy do not support the limitations opined. Finally, the therapist appears to attribute the claimant's difficulties to family stress rather than specific impairments.

(R. 28.)

The ALJ partially addressed the consistency of the opinion for purposes of 20

C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) insofar as the ALJ referenced a lack of

"intensive" mental health treatment.  But similar to the ALJ's treatment of Dr. Wagner's

opinion, the ALJ failed to adequately address the supportability of Therapist Moua's

opinion.  The Court acknowledges that the ALJ found Therapist Moua's opinion "not . . .

to be entirely persuasive as it is inconsistent with the therapist's own treatment notes

which do not support this degree of limitation." (R. 28.) "An ALJ's reasoning need only be clear enough to allow for appropriate judicial review." *Grindley v. Kijakazi*, 9 F.4th 622, 631 (8th Cir. 2021). But here, it is unclear what about the treatment notes led to the ALJ's conclusion. The Court acknowledges, as argued by the Commissioner (Dkt. 10 at 14), that an "ALJ may find less persuasive a treating physician's checkbox opinion where the listed limitations are not supported with the physician's treatment, notes, or objective evidence" and "While a checkbox MSS is not deficient per se, the format may impact the ALJ's assessment of the opinion's persuasiveness based on the factors in § 416.920c(c)." *Nar B. G. v. O'Malley*, No. 23-CV-2076 (JWB/JFD), 2024 WL 4236799, at *8 (D. Minn. July 8, 2024) (citation omitted), *R. & R. adopted*, 2024 WL 4132424 (D. Minn. Sept. 10, 2024). That said, the Court rejects any assertion that a supportability or consistency analysis does not need to be performed as to any opinion merely because of its format, or that a check-box format can gloss over imperfect compliance with the regulations—even if the ALJ did make some attempt to comply with those regulations.

On remand, the ALJ shall address the supportability of Therapist Moua's opinions, including the specific references, if any, that the ALJ is relying upon as to Therapist Moua's treatment notes; as well as the consistency of the opinions to the extent the ALJ is relying upon Plaintiff's daily activities to discount each of the opinions rendered by Therapist Moua. This includes specifying which activities contradict the various levels of Plaintiff's mental functioning set forth by Therapist Moua. The Court does not intend to limit what the ALJ can rely on in the record, but the reliance must be set forth in a

manner that allows the Court to meaningfully assess the rationale and decide any

challenge to the decision.

### c.    *CNP Sumo*

With respect to CNP Sumo's opinions as to Plaintiff's physical limitations,

Plaintiff argues:

- The ALJ failed to perform a consistency analysis as to CNP Sumo's opinion, thereby requiring remand.  (*Id.* at 19.)

- The ALJ erred by rejecting Sumo's opinion regarding "moderate" limitations in standing and walking as "vague" without further development of the record and how the ambiguity was considered and resolved.  (*Id.*)

- The ALJ erred by not finding that the Plaintiff was limited to sedentary RFC given that Sumo opined that she could only lift up to 10 pounds, albeit frequently.  (*Id.* at 20.)

As to CNP Sumo's opinions, the ALJ found as follows:

The claimant underwent a consultative exam in November 2021 and had a normal neurologic exam. (Ex. 6F.) The claimant exhibited 5/5 strength in motor function in the upper and lower extremities. Sensation was intact and reflexes were symmetric. Cerebellar function was intact. Memory was normal and her thought process was intact. No gait abnormalities were noticed. There was full range of motion in all joints, and 5/5 strength in her muscles. Tendon function was normal. The claimant had a steady gait. There was mild tenderness with palpation of the bilateral shoulders. She was able to lift 10 pounds in the clinic. There was tenderness at the left sciatic with palpitation and pain with flexion and extension. The claimant was able to rise from a chair and get on/off the exam table. She was able to reach overhead. She was able to tandem walk and walk on her heels, but was not able to walk on her toes. Straight leg raise was negative. An x-ray showed mild degenerative spondylosis of the lumbar spine. The doctor opined that the claimant was limited to moderate standing/walking in an 8-hour day due to back pain, and that she should avoid prolonged standing/walking of more than minutes at a time. She could sit moderately in an 8-hour day. Postural activities were limited to occasional for bending due to back pain. The claimant could perform fine manipulation frequently, and could lift up to 10 pounds frequently. (Ex. 6F.) The undersigned finds this opinion to be

partially persuasive as the clinical and exam findings do support limiting the claimant to a light level of exertion. The imaging findings were only mild in nature. There was no clinical support for limitations in fine manipulation and this is finding is not persuasive. The findings with respect to moderate limitations in standing, walking and sitting are vague, and also not supported by the clinical findings on exam or the record as a whole. The claimant was able to lift up to 10 pounds frequently, and this is consistent with the record and is not inconsistent with a light level of exertion.

(R. 26.)

The Court disagrees with Plaintiff's argument that the ALJ failed to conduct a consistency analysis as to CNP Sumo's opinion outside of the opinion regarding to moderate limitations in standing and walking. The ALJ noted that the imaging findings were only mild in nature, and there was no clinical support for limitations in fine manipulation. (R. 26.)

With respect to CNP Sumo's stand/walk limitations for Plaintiff, she found "one might consider stand/walk limited to moderately hours in an 8-hours day due to back pain, avoid prolonged standing/walking of more than minutes at a time; can sit moderately in an 8-hour day." (R. 330.) While the ALJ concluded that this limitation was vague, the ALJ went on to address whether it was consistent with the record. An ALJ cannot assign weight to a medical opinion without addressing the ambiguities of that opinion and the ALJ's RFC. *See* SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996) (providing that an ALJ must explain the resolution of any material evidentiary inconsistencies or ambiguities in assessing an RFC). The Commissioner does not address this issue in his brief. Without a specific discussion or explanation by the ALJ, the Court is unable to meaningfully review this portion of the decision where the ALJ appears to

have discounted CNP Sumo's opinion as to Plaintiff's limitations to walking, standing, and sitting on consistency grounds. *See Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (quoting *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000) ("While a 'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case,' inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis to remand.").

On remand the ALJ shall resolve any ambiguity as to the opinion, including obtaining further clarification from CNP Sumo (if possible), regarding the meaning Sumo's opinions regarding Plaintiff's ability to sit, stand, and walk. Given the remand, the ALJ must also clarify with CNP Sumo whether she meant that Plaintiff could lift up to 10 pounds, or whether a maximum of 20 pounds is appropriate, given the ALJ's assignment of a light exertional level with no further restrictions on lifting in the RFC.[10] As noted by the Commissioner, lifting up to 10 pounds frequently can also be consistent

---

[10]    Pursuant to the Social Security regulations, light work is defined as follows:

> Light work involves **lifting <u>no more</u> than <u>20 pounds</u> at a time with <u>frequent</u> lifting or carrying of objects weighing <u>up to 10 pounds</u>**. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b) (emphases added).

with a light RFC.  (Dkt. 10 at 15.)  In any event, clarification from the agency's own consultant is necessary.  The ALJ shall then conduct a fulsome analysis under 20 C.F.R. §§ 404.1520c, 416.920c of the opinions.

* * *

As a final matter, the Court notes that on remand, the ALJ's analysis of Plaintiff's subjective complaints could be affected by the opinions of Dr. Wagner, Therapist Moua, and/or CNP Sumo.  Therefore, the Court does not address any further arguments by Plaintiff as to subjective complaints at this time.  That said, the Commissioner is free to address any of the other issues raised by Plaintiff on remand.  To the extent necessary, the ALJ should put a new hypothetical question to the VE; and based on the resulting testimony, to reconsider the finding at step five.

For all these reasons, the Court grants Plaintiff's request for remand of the Commissioner's decision.

## V.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    Plaintiff M.Y.'s Motion for Summary Judgment (Dkt. 7) is **GRANTED** in part;

2.    The relief requested in Defendant's SSA Brief in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. 10) is **DENIED**;

3.    This case is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Court's Order; and

4.    The Announcement of Decision scheduled for March 25, 2025 at 3:00 p.m. is **CANCELLED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

DATED:  March 3, 2025                          *s/Elizabeth Cowan Wright*
                                              ELIZABETH COWAN WRIGHT
                                              United States Magistrate Judge